**C & W LEASING, INC., Plaintiff–Counter–Defendant–Appellant,**

v.

**ORIX CREDIT ALLIANCE, INC., Defendant–Counterclaim Appellee.**

**No. 89–4012.**

United States Court of Appeals, Eleventh Circuit.

April 1, 1992.

On Petitions for Rehearing June 2, 1992.

---

816

Kenneth L. Mann, Orlando, Fla., for plaintiff-counter-defendant appellant.

Lawrence M. Watson, Jr., David S. Oliver, Michael S. Orfinger, Carlton, Fields, Ward, Emmanuel Smith & Cutler, Orlando, Fla., for defendant-counterclaim appellee.

Before TJOFLAT, Chief Judge, COX, Circuit Judge, and GODBOLD, Senior Circuit Judge.

GODBOLD, Senior Circuit Judge:

This removed diversity case involves a controversy between borrower and lender over three aspects of a loan. The borrower, C & W, alleged that Alliance, the lender, misrepresented the rate to be charged on the loan, miscalculated the amount of interest necessary to be paid upon prepayment, and inflated the amount necessary for prepayment by including an improper charge, and refused to pay to C & W the funds generated by the charge.

C & W prepaid the loan and sued Alliance on a number of jury-tried theories— fraud, civil theft, Florida RICO, and conversion—and non-jury counts for reformation and rescission. The court granted a directed verdict for defendant on the RICO claim. The jury found for C & W on the count for conversion and for Alliance on all other counts. It entered a special verdict denying punitive damages. The court granted judgment n/o/v on the conversion count. It denied reformation and rescission. Consequently Alliance wholly prevailed. C & W appeals.

We affirm the directed verdict on the RICO claim, reverse the judgment n/o/v on the conversion claim, reverse on all other counts tried to the jury because the court erred in a crucial evidentiary ruling and in instructing the jury, reverse the special verdict denying punitive damages, and reverse the denial of reformation and rescission.

## I. The history

One of C & W's principal customers was ALAD, which was in financial difficulty. C & W and ALAD agreed that C & W would seek a loan and would lend the funds to ALAD. For this service Creeden, the principal of C & W, would be given stock in ALAD. C & W sought to obtain a loan at a rate not to exceed 16%.

Through CIC, a Florida company which served as finder or broker, C & W received a loan commitment letter from Alliance. The letter set out the principal amount, termed an "advance," of $1.5 million; the amount of the note, $2,172,000; and a schedule of 60 monthly payments declining annually. The loan was to be "front-end loaded," i.e., payments for each of the first 12 months were to be $56,938, declining in months 49 through 60 to $18,824. No interest rate was stated although the cost to C & W of the funds, $672,000, was apparent from deducting the "advance" from the amount of the note.[1]

Security was required consisting of assets of C & W and personal guaranties by individual principals of C & W, and assets of ALAD and guaranties by ALAD and its principal.

The claim that Alliance misrepresented the interest rate arises from conversations concerning the interest rate, conducted before the loan was closed, between at one end Cole (an Atlanta-based officer of Alliance who worked with broker-originated loans) and at the other end, Sutton (the broker), and Wells and Morrison (attorneys for C & W). Cole was asked what was the rate, or the cost of the money. According to Cole, he responded that it was "15.65% running rate."[2] Persons at the other end deny he used the term running rate and say they had never heard of a running rate until controversy arose between the parties.

There was testimony that in at least one of these conversations Cole referred to a complex formula pursuant to which the figure he gave would be converted to an add-on rate and to the schedule of payments that would be required. There was testimony that Cole said the complex formula was used in Alliance's New York office and that he did not understand it but that it was predicated on the 15.65% figure.

---

1. Alliance refers to this $672,000 by the euphemism "cost of loan" rather than interest. It does not suggest, however, that there was any cost to C & W that was included in this amount other than interest. An "investigation fee" of $15,000 was paid by C & W, but this amount was separate from the loan.

2. There are slight variations in the quoted terminology, but they are not material to the issues before us.

Attorney Wells testified that he understood from Cole's description of converting to an add-on rate and setting up a schedule of payments that the converted rate would be equivalent to 15.65%.

There was evidence, with which all agree, that the actual interest rate to maturity was 20.24%. Cole testified by deposition that he himself calculated the payment schedule following instructions from the president of Alliance that the return to Alliance should be about 20%, and, after deducting a broker's fee, a net to Alliance of about 18%.

According to Wells and Morrison, they discussed the commitment letter with C & W and inserted some modifications. They told C & W that the interest rate was 15.65%.

The commitment letter required that C & W's counsel supply an opinion letter, using Alliance's standard form, which was to indicate that mortgagors of property given as security had good title and that liens to be created would be valid. Before the loan was closed and the note signed, Wells, who was to furnish the opinion letter, performed calculations under the sum of digits method because he had to assure himself that in the event of prepayment within one year the interest paid would not exceed the Florida large loan usury rate of 25% and thereby possibly cause the loan to be unenforceable. Alliance acknowledges in its brief that Wells' intent was to calculate the interest rate in the event the loan was prepaid within one year. Wells came up with a figure of 22.09%. He testified that he did not report his calculation to C & W. Wells was capable of calculating the interest rate produced by the schedule of payments (20.24%), but he did not do so. He testified that he saw no need to check the figure Cole gave.

The loan was closed. C & W signed a note that embraced the terms of the commitment letter. C & W, ALAD, and the principals of the two companies signed a guaranty.[3]

Concurrently C & W reloaned to ALAD the funds received and was reimbursed by ALAD for the investigation fee that it (C & W) had paid to Alliance. The ALAD–C & W note was a "mirror copy" of the C & W–Alliance note.

Less than two months after the closing ALAD's bookkeeper found that, utilizing a 16% rate, she could not allocate on her books principal and interest components of ALAD's monthly payments to C & W. According to her testimony, after six to seven hours of unsuccessful efforts to prepare an amortization schedule, she talked to Wells and Morrison, who told her the note was represented by Cole as having an interest rate of less than 16%. She called Alliance, seeking the interest rate, and was told that it did not furnish amortization schedules to customers. She then asked ALAD's CPA to prepare a schedule. Using a hand calculator and a trial-and-error effort, he was able to calculate, after 10 to 12 hours of work, that the annual percentage rate to maturity was 20.24%. This information was passed on to C & W, which had its accountant check it, using a computerized machine that contained present value tables. He was able to confirm the 20.24% figure in around 15 minutes.

C & W had recognized in its original dealings with ALAD that if ALAD did not operate profitably it would be closed down or sold and the loan paid off. About seven months after the Alliance loan was closed C & W and ALAD found a buyer for ALAD's assets. C & W elected to prepay the Alliance loan and called on Alliance for a prepayment figure and supporting calculations. Alliance gave a figure. ALAD's assets were sold, and on the same day C & W paid Alliance but with a written protest of the amount. Later it filed this suit.

C & W's theories run this way:

(1) Alliance fraudulently misrepresented the interest rate on the loan. Cole represented that the rate was 15.65%, while the actual annual percentage rate was 20.24%. This resulted in inflation of the amount required to prepay.

3. The note was payable to CIC and endorsed by it to Alliance. Alliance claimed to be a holder in due course. This defense was struck in state court before the case was removed.

(2) Alliance fraudulently miscalculated the amount required for prepayment by double charging interest for the month in which the loan was prepaid, thereby overstating the required prepayment by $10,930.

(3) Alliance fraudulently miscalculated the prepayment as follows. Unknown to C & W, Alliance had paid a $50,000 finder's fee to CIC. By agreement between Alliance and CIC, in the event of prepayment Alliance was given a right to recoup from CIC a ratable amount of the finder's fee.[4] The method for calculating prepayment of the loan was set out in the note. The formula was to begin with the difference between the face of the note and the amount advanced (i.e., $672,000). This was to be adjusted by the "Rule of 78's" or the "Sum of the Digits," producing the amount of a "refund" to C & W. According to C & W, Alliance treated the "difference" between the face of the note and amount advanced as $622,000 rather than $672,000; i.e., Alliance deducted from the component of $672,000 the secret finder's fee that Alliance had paid to CIC. The consequence was that the "refund" to CIC was reduced by $31,858.59 and the net amount that C & W was out of pocket was increased in the same amount. In this way, according to C & W, Alliance passed on to C & W, and required C & W to pay, a substantial part of Alliance's loan expense consisting of the unearned portion of the finder's fee. Alliance then waited to see if it would be able to recoup from CIC that part of its loan expense. After prepayment Alliance called on CIC to repay to it the "unearned" portion of the finder's fee, $31,858.59, and CIC did repay. Alliance was then obligated to remit these funds to C & W because it had inflated the payoff in this amount. Alliance tendered to C & W a check in the amount received from CIC but wrote into the check a general release of all claims against Alliance and CIC. C & W refused the check because of the general release and remains unpaid. C & W contends Alliance converted C & W's funds by requiring

it to pay the $31,858.59 and by retaining those funds and, once Alliance had been reimbursed by CIC, committed another act of conversion by withholding payment to C & W of the funds to which C & W was entitled.

We turn to Alliance's contentions. With respect to the fraud in the inducement claim, (1) above, Alliance does not contest that Cole, when asked what the rate was, gave a 15.65% figure. But Alliance says that Cole identified this figure as the running rate, and that C & W and Sutton erroneously misunderstood it to be the annual percentage rate if the loan were carried to full term. During trial Alliance repeatedly urged that the case did not concern at all a misrepresentation of an interest rate but rather was a mere businessman's dispute or misunderstanding concerning a "complex formula." This phrase refers to testimony that Cole told Wells that Alliance's office in New York used a complicated formula to convert 15.65% into a rate that was used for the purpose of calculating the face amount of the note and the amounts of monthly payments. As we discuss below, this characterization by Alliance of the central issue in the fraud claim led the court into error. Alliance also asserts that C & W did not rely upon Cole's representations concerning rate because Wells made calculations concerning the rate in the event of prepayment within a year. Additionally, Alliance urges that because Wells made the calculations of the rate that would result in the event of prepayment after one year, and in fact C & W did prepay within one year, C & W suffered no damage from Cole's representation of the rate.

Cole testified at length by deposition as to what a running rate is. From the evidence a jury could infer that it is a valid term used in the finance industry and communicated to any Alliance customer who inquires as to the rate on his add-on loan (that is, a loan in which no rate is stated). Add-on loans constitute approximately 98% of Alliance's loans. Or, from the testimo-

---

**4.** The finder's fee would be treated as though earned over the life of the loan and the "un-

earned" portion would be repaid to Alliance.

ny, the jury could infer that running rate is a misleading device conveying no meaningful information to a customer like C & W and possibly having no relationship to a front-end loaded loan like C & W's. It is without dispute, however, that running rate is not the annual percentage rate of the loan carried to maturity, which in this instance all agree was approximately 20.-24%.

## II. The jury instruction

■ The court instructed the jury:

Defendant also contends that there was a bonafide [sic] good faith disagreement of the parties in the interpretation of a complex formula in the transaction. A difference of opinion as to the meaning of a complex formula is not necessarily a misrepresentation of a fact. If you find there was a good faith disagreement of the parties as to the meaning of a complex formula on any or all of Plaintiff's claims of fraud in this transaction, and not a misrepresentation of fact, your verdict should be for Defendant on that claim or claims of fraud.

As adjusted to the facts, as to at least two of C & W's claims, this instruction mischaracterized the issues and was misleading.

At least the following issues emerge concerning alleged misrepresentations asserted in the fraud claim and the related civil theft claim.

(a) When Cole was asked what the interest rate was, or the cost of money was, if he gave the figure of 15.65% without describing it as the running rate, was this answer by itself a misrepresentation, since the annual percentage rate on the loan carried to maturity was 20.24%?

(b) If Cole did describe the figure as the running rate, was this a misrepresentation on the ground that running rate was not applicable to a loan such as C & W's?

(c) By the inquiry to Cole concerning interest rate (or cost of money), and Cole's answer, was there a representation by Cole that 15.65% would be converted into an add-on rate that would be equivalent to 15.65%? Or did the conversation convey that the add-on rate (and payment sched-

ule) would be at a rate higher than 15.65%? Or was the conversation neutral with respect to what the rate would be after 15.-65% was converted to add-on (and the payment schedule set up accordingly)?

(d) If Cole described 15.65% as the running rate, did he misrepresent by saying this was converted into an add-on factor and to the payment schedule by use of a complex formula that he did not understand, and that this calculation was done in the New York office, when in fact he himself calculated the payment schedule and did not utilize the 15.65% figure but instead followed an instruction to earn approximately 20% for Alliance?

These are issues of representations allegedly made by Cole. It misdescribes them to sweep them into the phrases "a bonafide good faith disagreement of the parties in the interpretation of a complex formula" and "a difference of opinion as to the meaning of a complex formula." Wells acknowledged that Cole referred to a complex formula that would be used to convert 15.65% into something else, but he stated that he understood the result of conversion would be an equivalent rate. Insofar as alleged misrepresentations are concerned, the contour and contents of the complex formula and of the conversion process are not the subject of disagreement, indeed as between Cole and those speaking for C & W they were not even stated.

The "complex formula" statement may, of course, be relevant to the issue of whether C & W relied upon what Cole represented. But, again, this is not a dispute over the contours and meaning of the complex formula, which were never disclosed or discussed.

Additionally, the issue of whether Cole misrepresented that the complex formula was used in New York and that he did not understand it, when in fact he calculated the monthly payment schedule, has no relation to the meaning or interpretation of the complex formula itself.

Moreover, the instruction was in terms of "all of Plaintiff's claims of fraud." The claim arising out of alleged inflation of the prepayment to require C & W to make Alliance whole on the finder's fee expense,

(3) above, has no relation to any formula, complex or otherwise.

With respect to the asserted double calculation of interest for the last month in figuring the amount necessary to prepay, (2) above, it is arguable that this can fairly be said to involve a "complex formula." If it does, it is a different one than discussed above. C & W asserts that what is involved is not a disagreement about the formula, which is included in the note, but simply a misapplication of it by Alliance. We leave to the district court whether a properly narrowed "complex formula" instruction would have application to this particular claim.

Because we must reverse on the fraud-based claims, the verdict denying punitive damages, insofar as it relates to these claims, must be reversed as well.

### III.  Rescission and reformation

■ The court denied equitable relief of rescission and reformation for reasons many of which are inextricably entangled with the issues submitted to the jury. The judge is bound by the jury's determination of a legal claim as it affects his disposition of an accompanying equitable claim. *Caputo v. U.S. Lines Co.*, 311 F.2d 413 (2d Cir.) *cert. denied* 374 U.S. 833, 83 S.Ct. 1871, 10 L.Ed.2d 1055 (1963). Because the jury's determinations were made pursuant to the erroneous instruction we have discussed, the court's denial of rescission and reformation must be vacated.

### IV.  Admission into evidence of ALAD's note to C & W

■ C & W moved *in limine* to prevent Alliance from offering evidence of ALAD's note to C & W. Alliance proposed to offer this on the theory that proof of damages is a prerequisite of the cause of action for fraud because a plaintiff must show that it relied to its detriment and the note tends to establish that C & W suffered no damages from any acts of Alliance. It was not disputed that, pursuant to the ALAD–C & W note, ALAD made monthly payments to C & W, each in the same amount as C & W's monthly payment to Alliance. C & W then made its monthly payment to Alliance in the same amount. C & W was reimbursed by ALAD for the prepayment. The court denied C & W's motion and admitted the note in evidence.

The district court erred. The evidence was irrelevant. C & W borrowed from Alliance. ALAD was not a party to the loan and was not at risk. It owed no obligation, legal or equitable, to Alliance beyond the security of its assets. With the knowledge of Alliance, C & W reloaned the proceeds to ALAD. ALAD undertook an obligation to C & W to pay C & W an amount equal to what C & W paid. ALAD honored that obligation. This did not diminish C & W's damages, if any, suffered at the hands of Alliance. ALAD was a stranger to damages between Alliance and C & W. It was not a party to this suit.[5]

ALAD and C & W were co-guarantors. Alliance has suggested no principled basis for concluding that this relationship resulted in C & W's having no damages. It has not suggested any other relationship between C & W and ALAD—for example, alter ego, agency, joint enterprise—that arguably might produce the result that if C & W were charged a higher rate than represented to it by Alliance it suffered no damage. During trial Alliance often referred to the loan as a "pass through loan," implying that C & W could suffer no damage from such a transaction. But the phrase was not defined nor were applicable standards explored. The issue of whether the loan was a "pass through," and the consequences if it was, were not the subject of instructions to the jury.[6]

Alliance makes an alternative argument that the ALAD–C & W note was admissible as evidence that C & W did not rely on any representation by Alliance but rather relied on its right to receive payments from

5. Originally Alliance asserted that ALAD was an indispensable party, but it abandoned this contention.

6. C & W contends that the note was inadmissible because of the collateral source rule. That rule comes into play, if at all, in determining how much plaintiff may recover, after it is established that plaintiff has been injured. This is not a collateral source case. Alliance asserts the C & W–ALAD transaction as evidence that C & W was not injured. The issue is relevance, not collateral source.

ALAD that would equal the amount C & W agreed to pay Alliance. Again, this is a matter of relevance. C & W sued alleging misrepresentation that caused it to enter into a deal with Alliance. Absent some proof of a principled legal basis for linking the Alliance–C & W deal with the C & W–ALAD deal, the motivations that brought C & W to trade with ALAD are not relevant to the issue of what C & W relied upon in trading with Alliance. Were Alliance correct, a defrauded lender cannot recover from his defrauder if he plans to utilize the loan proceeds in a third-party transaction and in that transaction comes out even or ahead.

## V. Introduction of Wells' calculations

■ C & W moved *in limine* to exclude Wells' calculations concerning the interest rate that would apply if there were a prepayment after one year. The court denied the motion. Alliance introduced the calculation and referred to it in argument. We hold that the court abused its discretion in permitting admission of this evidence.

Wells explained that to write the required attorney's opinion letter he had to assure himself that the first year's repayment on the front-end loaded loan would not exceed the Florida large loan usury rate of 25%. Alliance acknowledges that Wells only intended to calculate the first year's rate that would apply in the event of prepayment. Wells testified that his calculation did not cause him to suspect that the rate to maturity was other than the rate figure represented by Cole. He testified that he did not tell C & W of his calculation.

Alliance suggests that the calculations were relevant on the issue of reliance, i.e., they tended to show that C & W did not rely on Alliance's alleged misrepresentations of rate through maturity but rather on Wells' calculation of the rate to a one-year prepayment, i.e., since C & W elected to prepay it neither relied on nor was damaged by Cole's representations. But the undisputed evidence was that Wells never told C & W of his calculations. Moreover, the argument assumes that the C & W–

Alliance agreement was for a loan that unconditionally would be prepaid. Prepayment was not embraced in the loan terms except as a possibility. That possibility came to fruition months later after a buyer was found for ALAD's assets.

## VI. Conversion

■ At the close of its case in chief C & W was permitted to orally amend to conform to the evidence by adding a claim for conversion. In a subsequent colloquy counsel for C & W told the court that C & W relied upon two theories, a wrongful taking of its money by Alliance at the time of prepayment and a wrongful withholding, when, after being repaid by CIC, Alliance tendered funds to C & W conditioned upon C & W's giving a general release.

The jury returned a verdict for C & W for $31,858.59 on the common law conversion count. The district court granted judgment n/o/v for Alliance on this count. It recognized that money may be subject to conversion under limited circumstances, including the circumstance where there is an obligation on defendant to keep intact or deliver specific money. The court's rationale was as follows: (1) C & W never made a demand for $31,858.59; (2) the sum was not sufficiently identified in pleading or proof; (3) there was no specific money based on a specific method of determination; (4) there was no obligation to keep intact or deliver specific money.

In October 1985, some 41 months before trial, C & W had filed an amendment to the complaint that added Count VI, charging theft as defined in Fla.Stat. 812.012(2), .014. This count alleged that Alliance was guilty of theft of $31,858.19. It described the finder's fee. It charged that Alliance had overcharged $31,858.19 by improper calculation, which caused Alliance to demand and C & W to pay "an unwarranted payoff figure of $31,858.19 more than actually necessary to satisfy the loan under the formula devised by Credit Alliance." It alleged that Alliance had refused to return the $31,858.19. Additionally, the count charged that Alliance had obtained this property of C & W by means that are set out in the Florida statute—"fraud, decep-

tion, false pretenses, *conversion*, or other conduct similar in nature."

In its answer to the theft count Alliance denied that there had been any overpayment. It admitted that C & W had demanded "monies." It alleged that C & W was not entitled to any money.

The pretrial order set out as an admitted fact that CIC had returned $31,858.*59* to Alliance[7] and, after receiving that amount, Alliance had tendered it to C & W by a check that contained a general release of all claims against Alliance and CIC.

Under these circumstances a sum was sufficiently identified and was based upon a specific method of determination. It consisted of the amount of $31,858.59 that Alliance had included in its calculations and had received from C & W, and had demanded of and received from CIC, and had tendered to C & W. Under the evidence, Alliance calculated this amount before it communicated to C & W the sum necessary for prepayment and improperly included the amount in the figure required for prepayment. Alliance considered, and made a judgment decision, that it would include this amount in the total C & W was required to pay as prepayment and that once it recouped from CIC it would pass on to C & W the funds recouped. By its own evidence, once Alliance was repaid by CIC, it was obligated to deliver $31,858.59 to C & W. It withheld the funds from C & W not because C & W was not entitled to them but because Alliance required as a condition a general release of all claims against it and CIC. It was not entitled to impose this condition. We do not need to decide whether Alliance was a convertor in the first instance by demanding from C & W, and receiving $31,858.59. One can characterize the funds that Alliance was obligated to hand over to C & W as funds wrongfully extracted from C & W and held by Alliance until it recouped from CIC, or as the funds that came to Alliance from CIC, to which, under Alliance's own evidence, C & W was

entitled. In either event, by withholding the funds upon condition of receiving a general release, Alliance was a convertor pure and simple.

The trial judge was troubled by the fact that in the pretrial order and in documents relating to a motion for directed verdict and judgment n/o/v, plaintiff referred to the conversion claim in the amount of $31,606.00. In the welter of confusing calculations in this case it is not clear where the difference of some $253 arose. But this difference is not determinative. As set out in the theft count, filed long before trial, it was clear that C & W claimed that Alliance had committed a conversion of $31,858.19. That count gave the details of how Alliance had obtained the money from C & W and how it had refused to unconditionally pay over to C & W the funds received from CIC. The testimony at trial substantiated the allegations.

The verdict of the jury awarding actual damages for conversion must be reinstated. The jury verdict denying punitive damages must stand insofar as it relates to the conversion count.

## VII. Other issues

The court did not abuse its discretion in rejecting the proffer of the testimony of an Atlanta attorney concerning another loan transaction by Alliance.

AFFIRMED in part, REVERSED in part, VACATED in part, and REMANDED.

On Petitions for Rehearing

June 2, 1992.

Before TJOFLAT, Chief Judge, COX, Circuit Judge, and GODBOLD, Senior Circuit Judge.

BY THE COURT:

The petition for rehearing filed by Orix Credit Alliance, Inc., is DENIED.

The petition for rehearing filed by C&W Leasing is GRANTED in these respects:

7. We attribute no legal significance to the difference of 40 cents between the amount stated in

the amendment and the amount verified by Alliance and adopted by the jury.

[Editor's Note: Opinion corrected for publication.]

In all other respects the petition for C&W Leasing is DENIED.